# THE STATE v. E. W. BAKER, Appellant.

### Division Two, December 23, 1914.

1. **EVIDENCE: Error in Exclusion: Cured by Cross-Examination.** On a trial for embezzlement, error in sustaining an objection to a question whether the prosecuting witness' had expected to marry the defendant was cured by the fact that after such ruling the witness was fully cross-examined on that point and stated that there was a prospect that they might marry in the future.

2. ——: **Theory of Defense: Embezzlement.** While it is true that when the evidence in a criminal case tends to establish a defense inconsistent with the testimony of the defendant, he is not bound by his testimony, but is entitled to instructions on the theory shown by the other evidence, yet he may not cause the court and adversary counsel to pursue a certain course and then at the outcome repudiate its legal validity; and accordingly, where a defendant on trial for embezzling $2000 testified that he never received the sum in question, and his attorneys at the trial said they did not claim it was borrowed money, the testimony of the prosecuting witness at the preliminary examination was properly admitted at the trial, although the examining court had refused to permit her to say whether she had received $50 for the use of $200 lent the defendant at another time, thus, the defendant asserts, denying him the right to a full cross-examination, and of the value of a fact, if the question had been affirmatively answered, from which the jury might have inferred that the $2000 was a loan also.

3. ——: **Judge's Comment at Preliminary Hearing: Incompetent at Trial: Harmless Error.** Although comment on the evidence by a judge at a preliminary examination is not competent evidence on the trial, yet where the evidence itself was before the jury and clearly bore out the judge's comment, the admission of the judge's expression was harmless error.

4. ——: **Impeaching Witness: Particular Instances of Misconduct.** The character of a witness cannot be impeached by showing through other witnesses special instances of misconduct.

5. ——: **Admissibility: Embezzlement: Defendant Showing Possible Use of Money by Prosecutrix.** Proof that the prosecuting witness, since deceased, whose testimony at the preliminary

262Mo44

hearing was read in evidence at the trial of the defendant for embezzlement, had been in trouble with the Federal officers and had hired lawyers to represent her, was not competent without a showing that the lawyers were paid the money the defendant was charged with embezzling.

6. ORDER OF PROOF: Discretion of Court: Embezzlement. The order of testimony rests largely in the discretion of the trial court, and it is not error to admit in rebuttal testimony which might have been given in chief.

7. ARGUMENT of Counsel: Epithets not Approved: Non-prejudicial Error. Epithets applied to a defendant by the State's attorney in his argument to the jury are not approved, but where the court is satisfied that calling the defendant a "crook" did not influence the verdict there is no ground for reversal.

8. ———: Expressing Belief in Defendant's Guilt: Non-prejudicial Error. An expression by the State's attorney in his argument to the jury of his belief in the defendant's guilt is not approved; but such misconduct of counsel is not reversible error when the evidence clearly justified a conviction.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

AFFIRMED.

*W. R. Scullin* for appellant.

*John T. Barker*, Attorney-General, and *Thomas J. Higgs*, Assistant Attorney-General, for the State.

ROY, C.—Defendant was convicted of embezzlement and sentenced to two years in the penitentiary.

The evidence for the State tended to show that on the 4th of January, 1912, Mrs. Mary L. Barber delivered to him in currency $2000, which, by agreement between them, he was to place in a safe deposit box in the bank for her and return to her on demand. She was between fifty and sixty years of age and had been twice married. She was seperated from her second husband, who lived in Denver. She owned the house in which she lived at 2316 South 12th street,

St. Louis. A son by her first husband and the son's wife lived with her. Her home was encumbered by a mortgage for $4000, which fell due May 8 or 9, 1912. One John W. Mackelden owed her $3000 secured by mortgage and she had other resources sufficient when converted into cash to clear the home of the encumbrance. She was a midwife and had been conducting a sanitarium, which she had recently ceased keeping.

The defendant was thirty years old, having a wife and one child. He had lived ten years in St. Louis and had been five years in the employ of the National Telephone Directory Company. His business was to procure contracts for advertising in the telephone directory.

Defendant and Mrs. Barber became acquainted in October, 1908, when he called to get her contract for advertising. Between that time and January 4, 1912, he secured six different contracts from her, ranging in amount from $36 to $225.

The evidence for the State was that defendant visited Mrs. Barber about twice a week, often taking her on car rides, to the theatre and to dinner; all of which he denied, except that he admitted that he was at her house about twice a month, also admitted that she did not know that he was married and that he was at her house half a dozen times after January 4, 1912, prior to his leaving the city about the first of February. In November, 1911, the defendant and Mrs. Barber visited a fortune teller, who told the fortune of each out of the hearing of the other. The fortune teller testified that while the defendant's fortune was being told he offered witness $50 if she would induce Mrs. Barber to let him have $1500; that the witness refused and told Mrs. Barber not to let defendant have her money, saying to her, "Go home to your own daughter and grandchildren; that man is too young for you; don't give him your money." Defendant in his evidence admitted that he heard the

fortune teller say to Mrs. Barber, "You go home to your family, don't go to supper with that man." He also testified that he advised Mrs. Barber to put her money in a safe deposit box and that she told him that in January she would have some money coming in. He testified that at various times he borrowed small sums from Mrs. Barber and paid her for the use of the money; that he loaned her various small sums; that he borrowed $200 from her in December, 1911, and that he paid it back. She testified that he returned the $200 with $10 for the use of it and then took it away again the same evening and that she hadn't gotten it back.

Mr. Mackelden testified that he paid Mrs. Barber $2000 in bills on her front porch on January 4, 1912.

Defendant's counsel at the trial conceded that she had the money. Defendant testified that she was owing him $45 and that he went to her house about January 4, 5, or 6, 1912, to get it. He then proceeded as follows, "She said she expected a party to pay her some money and he didn't come. I waited a while and she said some one is at the door now. She came in after while and handed me the money in bills." He stated that he saw only the $45.

Mrs. Barber testified that on January 4, 1912, she delivered to the defendant $2000 in bills, under a promise from him as follows: "I will put it in the safety deposit vault now and nobody can touch it, or find out where it is, and then the day you need it, all you have got to do is to let me know and I will bring it to you." Her daughter-in-law as a witness confirmed that testimony. Mrs. Barber also testified that the $2000 was not delivered to defendant as a loan.

About the first of February, 1912, the defendant left St. Louis and went to Chicago, where he stayed with his family until September 15 following. He did nothing while there and had no source of income. He

testified that during the time he was there his brother paid him a debt of $200 and that he became indebted to his brother for about $150. After defendant left St. Louis, Mrs. Barber made inquiries for him in vain, then reported the matter to the police. She testified that she had never recovered any of the money.

Mrs. Barber was dead at the time of the trial. She testified at the preliminary examination of the defendant in the court of criminal correction. She was asked on cross-examination whether she had not expected to marry the defendant. An objection to the question was sustained, but immediately afterwards she was fully cross-examined on that subject, and stated that there was a prospect that they might marry in the future. As a part of her cross-examination a letter written by her to the defendant's wife after his arrest was read in evidence, which contained the following: "If I had been able to come, I would have come to see you today. I am very sorry for you. If you feel half as bad as I do, you are indeed in need of sympathy. Of course, pity does no good. I have been acquainted with Mr. Baker some years but never knew he had a wife and the attentions he paid were those of a single man. We went to the theatre once or twice a week and took long car rides. He took me to dinner, I sit luncheon for him here and he spent evenings with me; New Year's Eve he stayed until twelve o'clock, then wished me many returns of the day. I said, where will we be next New Year? . . . I have been loaning him money for short periods. He brought it back at the agreed time, so he gained my confidence and when I received notice that my husband was going to sue me for half of my property, I just had four thousand dollars ready to pay a deed of trust off on my home. Mr. Baker urged me to get the money in cash and let him deposit it in a safety deposit and he would bring it to me the first of May when due."

Defendant's counsel then proceeded to question her on the theory that the letter stated or implied that the $2000 was a loan to defendant. Judge Falkenheimer, of the examining court, said, "No, that letter doesn't mean that, Mr. Scullin, by any manner of construction."

She was asked on cross-examination whether she had an agreement with defendant that he should pay her $50 for the use of the $200 which she loaned him. The examining court, without any objection being made, said, "That hasn't anything to do with this. For the purpose of this hearing we will assume that this woman loaned him money and got good compensation."

At the trial defendant objected to the reading in evidence of her testimony thus given, for the reason that by the above rulings the examining court had prevented defendant from fully cross-examining her. The trial court overruled the objection, and her testimony was read to the jury. During the reading of her testimony, 'the trial court said, "You do not claim that this was borrowed money;'" and defendant's counsel answered, "Not the $2000 or $4000."

On the cross-examination of Lizzie Burkett, the daughter-in-law of Mrs. Barber, defendant endeavored show that Mrs. Barber's sanitarium was closed in 1909 by reason of a fraud order issued by the government forbidding her the use of the mails. An objection was sustained. The following then occurred:

"Mr. Scullin: Can't I show the bad reputation of the prosecuting witness?

"The Court: Not in that way.

"By Mr. Scullin: Q. At the time did you know anything about your mother-in-law's business with her attorneys or business affairs? A. No, sir.

"Q. You do know, do you not, that she had business regularly with her attorneys?

"A. Mr. Maroney: I object to that.

"Mr. Scullin: I want to show the money was expended for the payment of attorneys.

"The Court: I do not see any bearing that it has.

"Mr. Scullin: I want to show the natural drain in the 'expenditure of money.

"The Court: I do not think it is competent.

"Defendent at the time duly excepts to the ruling of the court."

Also the following:

Mr. Scullin: I desire to show at the time of Mrs. Barber's death and for some time preceding the same, she had been in difficulties with the local health authorities and had employed Messrs. Zachritz & Bass to extricate her from those difficulties; and that in addition there was by reason of this controversy with the Bell Telephone Company over the publication of advertisements in the telephone book, by reason of an order of the Postmaster-General of the United States, prohibiting to Mrs. Barber the use of the mail for herself and her enterprise. I desire to show that at the time of her death and preceding the same Mrs. Barber had received decoy letters from Federal officers and had answered them and was being investigated by the Federal grand jury, and in answering those letters had made offers to procure abortions and to prevent conception in cases of intercourse, and that she had employed lawyers to protect her in this trouble and that is where the money went."

"Mr. Maroney: We object to that.

"The Court: I do not see what effect it would have even if granted; the objection will be sustained.

"Defendant at the time duly excepts to the ruling of the Court."

Officer Robert L. Agee testified that when arrested defendant said that he didn't remember Mrs. Barber; and that he didn't think she ever had any money.

On cross-examination defendant testified that he may have said when arrested that he did not know

Mrs. Barber, but that he misunderstood their meaning. He testified that he did not remember saying that Mrs. Barber never had two thousand dollars.

Officer Kilker, in rebuttal, testified as follows:

"Q. What was stated there? A. 'Mr. Baker, we have been looking for you for some time. Have you been out of town?' He said, 'Yes.' I said, 'You are under arrest.' 'What is the charge?' We said, 'You are charged with embezzlement, you got some money from a lady down south.' He said, 'Who is it?' We told him Mrs. Barber; Mrs. Barber has been living at 2316 South Twelfth street. He said, 'I don't remember the name; I don't remember her, I got no money from anybody.' I said, 'We will take you to the chief's office.' We took him up and he was identified by Mrs. Barber, she came there."

The defendant objected to such evidence on the ground that it was in chief and not in rebuttal. The objection was overruled.

State's counsel in his argument to the jury said: "Here is shown the crook going out and ingratiating himself into the favors of an old woman, resorting to every device known to the low man to gain her confidence, and then, like the man he is, violate it; and I want you men to sound a warning to this community that the cunningness of a crook won't save him."

Defendant's counsel objected to the above language and asked the court to tell the jury to disregard it. The court said, "It is for the jury to determine from the evidence."

The State's counsel in his argument also said: "What I want to say to you is that if I did not believe from the testimony in this case that a jury ought to find him guilty I wouldn't tell you to do it."

Defendant objected and asked the court to reprove the State's counsel. The court said: "He has the right to state he is conscientiously pursuing his

State v. Baker.

duty. It is for the jury to determine from the evidence, not from the speeches.''

I. The error of the examining court in sustaining the objection to the question asked Mrs. Barber as to whether she had expected to marry the defendant was cured by the fact that after such ruling she was fully cross-examined on that point and stated that there. was a prospect that they might marry in the future. [1 Thompson on Trials (2 Ed.), sec. 707; Inlow v. Bybee, 122 Mo. App. l. c. 482.]

**Evidence: Error in Exclusion: Cured by Cross-Examination.**

II. Counsel for appellant contends that the refusal of the examining court to permit Mrs. Barber to answer the question as to whether she and defendant had an agreement that she should receive $50 for the use of the $200 loaned him, was a refusal of the right to a full cross-examination and rendered the testimony of Mrs. Barber incompetent on the trial. Counsel insists that if he had been permitted to show that she was to receive $50 for the loan of the $200 it would have been a fact from which the jury could have inferred that the $2000 was a loan also.

**Embezzlement: Theory of Defense.**

Appellant is in no position to raise that point here. The trial court, after overruling defendant's objection to the reading of Mrs. Barber's testimony to the jury, and while it was being read, said, ''You do not claim that this was borrowed money?'' To which defendant's counsel answered, ''Not the $2000 or $4000.'' Mrs. Barber testified that the $2000 was not a loan. The defendant testified that he had never received it.

We are aware that it has been held, and properly so, that where the evidence tends to establish a defense which is inconsistent with the testimony of the

defendant on the stand, the defendant is not bound by
his testimony, but is entitled to an instruction on the
theory of the defense thus shown by the other evidence.    [State v. Bidstrup, 237 Mo. l. c. 285.]

If there had been evidence in the case tending to
show that the $2000 was loaned to defendant, it would
have been proper to submit that theory to the jury
though the defendant had testified to the contrary.
The defendant is not conclusively bound by his own
testimony.    But    a different    question is    presented
here.    When the trial court made the inquiry as to
whether defendant claimed that the $2000 was a loan,
and received the negative answer, the court was justified in acting on the theory that evidence on that point
was not material, and that the refusal of the examining court to allow her to answer such questions did
not render her testimony inadmissible at the trial.

Judge SHERWOOD said in State v. Clark, 121 Mo. l.
c. 512:

"Parties litigant are not allowed to take inconsistent positions, as attempted in the present instance.
They will not be permitted to cause the court and adversary counsel to pursue a certain course, and then
at the outcome deny and repudiate the legal validity
of that very line of conduct, and thus 'tread back and
trip up the heels of their adversary.'    [Slack v. Lyon,
9 Pick. 62; Brown v. Bowen, 90 Mo. 184; Bigelow on
Estop.    (3 Ed.), pp. 562, 601, 602; McClanahan v.
West, 100 Mo. 309.]"

III.    The    trial    court    permitted
Judge's Comment: the State's counsel to read to the jury
At Preliminary
Hearing.    in connection with Mrs. Barber's testimony the statement of Judge Falkenheimer to the effect that Mrs. Barber's letter to Mrs.
Baker did not mean that the $2000 was a loan.    That
statement of the judge was not competent evidence,
but it was certainly harmless.    It stated a fact that

was apparent to the jury. The letter was before them, and it did not express the idea that it was a loan, but clearly expressed the contrary. We are unable to see how the statement of the judge could in any way prejudice the defendant.

IV. The refusal of the court to permit the witness Lizzie Burkett to testify on cross-examination as to whether Mrs. Barber's sanitarium had not been closed by reason of a "fraud order" issued by the Postal Department was not error. The character of a witness cannot be impeached by showing through other witnesses special instances of misconduct. [State v. Sassaman, 214 Mo. 1. c. 735.] Neither was it error to exclude the other evidence offered to show other instances of the misconduct of Mrs. Barber.

*Impeaching Witness: Particular Instances.*

The offer of defendant to prove that Mrs. Barber was under investigation by the Federal grand jury, and was in difficulty with the local health authorities, was incompetent for the same reason, and his further offer to show that, by reason of such facts, she had employed lawyers to represent her in those matters and that her money went to pay the expenses growing out of such matters.

It certainly was not competent to show such matters in order to impeach Mrs. Barber. The fact that she had lawyers employed raised no presumption that the $2000 went to pay them. If defendant had any competent evidence that Mrs. Barber's lawyers got the money, the court was not informed of it, and it properly excluded the evidence offered.

*Showing Possible Use of Money.*

V. The court did not err in permitting officer Kilker to testify in rebuttal as he did. Such matters are largely in the discretion of the trial court. It is claimed that

*Order of Proof.*

the evidence given by him was such as should have been given in chief. It was said in State v. Murphy, 118 Mo. l. c. 15, "The order of testimony is a matter that must necessarily be left largely to the judgment of the trial courts, and unless a clear case of abuse is shown it is no ground for reversal."

VI. The State's counsel, in his argument to the jury, characterized the defendant as a crook. Judge NORTON, in State v. Zumbunson, 86 Mo. 111, held that invective when called forth by the character of the crime, will not justify a reversal. That case was cited with many others in State v. Rasco, 239 Mo. l. c. 581. It was said in the latter case that this court does not approve the use of epithets, but that if we are satisfied that the verdict was based solely upon the evidence and the law, uninfluenced by such language, the case will not be reversed.

In State v. Gartrell, 171 Mo. 489, this court said that calling the defendant an assassin and a snake was not reversible error, saying that counsel merely called the defendant what the evidence for the State tended to prove him to be. That case disapproved the use of epithets, and so do we. But where, as in this case, we are satisfied that such conduct of the attorney did not influence the verdict we see no ground for reversal. We call attention to State v. Gordon, 253 Mo. l. c. 517. Neither do we approve the conduct of counsel in expressing to the jury his belief in the defendant's guilt. But it is our duty to closely scrutinize the evidence and to judge whether such misconduct had a prejudicial effect on the jury. It is impossible for us to see how the jury could have reached a different conclusion. Under such circumstances, the misconduct of counsel does not amount to reversible error. There were other objections made to the language used to the jury by the prosecution, but the

necessary preliminary steps were not taken to bring the point here.

The judgment is affirmed. *Williams, C.,* concurs.

